```
               UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF FLORIDA
                        TAMPA DIVISION


In re                         )
                              )
LITESTREAM TECHNOLOGIES, LLC, )    Case No. 8:04-bk-03721-KRM
                              )
                   Debtor.    )
_____)
```

MEMORANDUM OPINION AND ORDER ON
OBJECTION TO CLAIM NUMBERS 29, 32, 33,
34 AND 45 BY AMERICAN CAPITAL CORPORATION

This is a confirmed Chapter 11 case in which all of the assets of the debtor have been sold. The "liquidating trustee" is holding enough money to pay creditors' allowed claims in full.

Four former executives of the debtor filed claims for pre-petition incentive compensation for 2003:

| Claimant | Claim No./Amendment | Amount |
|---|---|---|
| Philip Holdbrooks, CEO, Pres. | 32/94 | $15,833.00 |
| Francis Sivard, V.P. Finance | 33/92 | 11,667.00 |
| Michael Hughes, Controller, V.P. | 34 | 18,173.00 |
| Michael Savage, Manager | 29 | 7,950.00 |
| Philip Holdbrooks, CEO, Pres. | 45/93 | 5,846.16 |

One of the pre-bankruptcy equity holders, American Capital Corporation ("ACC"), objected to the claims because such compensation was never approved, pre-petition, by a 75% "Super Majority Vote" of the Board, as alleged to be required by the debtor's Operating Agreement. Therefore, ACC argues, the debtor has no legal obligation to pay these claims. For the reasons stated below, the objections to these claims are overruled and each claim is allowed.

BACKGROUND

The Debtor

The debtor was a Florida limited liability company formed in 2001 to build and operate fiber optic communication systems (for telephone, internet and television) in new residential communities. When this case was filed, the debtor was operating two partially-completed systems in Pasco and St. Johns Counties. The debtor lacked sufficient capital, however, to complete the systems in accordance with its contracts with the real estate developers. Eventually these systems, with the related equipment and contracts, were sold during the Chapter 11 case.

To obtain needed capital in the year before bankruptcy, the debtor gave ACC a 51% equity interest in

2

exchange for an investment of $10.25 million. ACC paid $2.75 million and delivered a promissory note for the remaining $7.5 million, payable within two years.[1] Payment of the note was secured by a pledge of the 51% equity interest.

Ownership of the debtor included ACC, TECO Fiber, Inc., one of the company's founders ("TECO Fiber"), and R&R Partners, LLC. The debtor's Board of Managers was enlarged to seven seats: ACC took a majority of four; TECO Fiber, two; and R&R, one. The new Board elected Philip Holdbrooks, an executive with TECO Partners, an affiliate of TECO Fiber, to be CEO.

A restated version of the debtor's Operating Agreement was adopted contemporaneously with ACC's purchase of its 51% interest. A "Super Majority Vote" of 75% of the Board was required for certain important matters on which ACC and TECO Fiber would have to agree.[2] Among other things, a Super Majority Vote was required for (1) "hiring or terminating an

---

[1] The closing was dated as of May 28, 2003. There were no scheduled installments due on the note; but ACC was required to make payments of $1 million if called for by the other members. ACC paid $3 million in capital calls to reduce the outstanding principal of the note to $4.5 million, before refusing to make any further payments in December 2003.

[2] Section 1.1 of the Operating Agreement defines "Super Majority Vote" as "approval by at least 75% of the Membership Interest entitled to vote or 75% of the Managers of the Company (as the context indicates)."

3

employee or agent of the Company, including senior management (*except to the extent such authority has been delegated pursuant to Section 8.9(p)*)," and (2) "any decision regarding the powers, authority and *compensation* of such person" (Section 8.9(q)). ACC contends that the power to grant executive compensation, either base pay or incentive pay, was never delegated to the CEO.

The 2003 Incentive Pay Program

Before ACC's involvement, the debtor awarded incentive pay to certain employees for 2002, including one of these claimants, Michael Savage. Beginning in January 2003, before ACC acquired its interest, the debtor was reporting accruals on its books for incentive pay.

In late 2003, Mr. Holdbrooks and senior management proposed incentive pay for themselves and other key employees. The proposed amounts were computed by multiplying each executive's base salary by: (1) an incentive pay percentage equivalent to TECO Partners' or Peoples Gas' incentive pay percentages, (2) the number of months of eligible employment, and (3) the percentage of stated business goals that the debtor achieved during the year.[3]

---

[3] The goals were to: (1) keep "EBITDA" below a $1,652,679 loss; (2) have capital expenditures of no more than $4,972,597; and (3) add

4

In November 2003, Mr. Holdbrooks circulated the proposed employee incentive pay for 2003. An ACC representative commented on the proposed incentive pay, even spotting certain miscalculations in the computations. ACC also requested that the proposed 2003 employee incentive pay be adjusted in certain respects. It was not until late December 2003, that ACC began voicing its objection to payment of the incentives to Mr. Holdbrooks and the other claimants.

Conflict Among the Equity Holders

The Board was scheduled to meet on December 12, 2003, to consider and act on "budget approval and acceptance" and "bonus plan and approval." By then, however, the owners were in conflict over control of the debtor. The Board meeting never occurred.

In December 2003, the debtor was experiencing cash flow problems. The debtor sent notice to ACC demanding payment of $1 million under the note. ACC notified the debtor that employee incentive pay should not be made without ACC's prior approval. On December 24, 2003, TECO Fiber made a

---

925 subscribing customers. In 2003, the debtor added 1,017 customers and had only $4,888,397 in capital expenditures; its losses exceeded the EBITDA goal, but only by $66,534 (4%). Thus, management concluded that the debtor had substantially met its goals for the year.

formal demand to ACC for the $1 million payment. Payment was due on or before January 7, 2004. ACC declined to pay.

On January 30, 2004, ACC filed suit in state court against the debtor, TECO Fiber, and its affiliate, TECO Energy, Inc. The complaint sought damages, alleging fraudulent inducement, rescission of contract, and declaratory relief. The debtor counterclaimed against ACC for the $4.5 million balance of the note and for disposition of the 51% ownership interest pledged as security.

The Bankruptcy

On February 26, 2004, three unsecured creditors filed an involuntary Chapter 7 petition against the debtor. On March 2, 2004, the debtor consented to the entry of an order for relief and converted the case to Chapter 11. Later, the debtor removed ACC's lawsuit to this Court.

The debtor's Chapter 11 plan of liquidation was confirmed on September 23, 2004. In turn, Larry Hyman was appointed as the estate's Liquidating Trustee. It is expected that unsecured claims will be paid in full. There will be a distribution to equity holders. ACC is the only equity holder who opposes the claims at issue here.

The Claims

*Mr. Holdbrooks' Claim*

Even though Philip Holdbrooks was working for the debtor, he was also employed full-time as an executive at TECO Partners.[4] In October 2003, he agreed to leave TECO Partners and work for the debtor full-time, on the condition that he would be eligible to receive incentive pay for 2003 and have certain expenses reimbursed.[5] Mr. Holdbrooks filed a proof of claim (Claim No. 32, amended by Claim No. 94) asserting that: (1) $15,833 is due for 2003 incentive pay; or, (2) if the 2003 employee incentive pay is disallowed, he is entitled to the reasonable value of the services he provided to the debtor for ten weeks.[6] Mr. Holdbrooks also filed a claim asserting an unsecured priority claim of $4,925 and a general unsecured

---

[4] He served from October 15, 2002, through the confirmation of the Chapter 11 plan.

[5] TECO Partners paid Mr. Holdbrooks severance through the end of 2003.

[6] Mr. Holdbrooks' base salary, set to begin in 2004, was $190,000. The incentive pay percentage, the same as TECO Partners would have applied, was 40%. Therefore, his target incentive was $76,000. The debtor achieved its 2003 goals, but Mr. Holdbrooks was CEO for only 2.5 months in 2003. The calculation is: $76,000 target incentive/12 = $6,333.34 x 2.5 months = $15,833.34. His original claim was for a slightly lower amount, $15,000; the claim was later amended to include the entire amount of incentive pay, $15,833.00, or in the alternative, a claim for reasonable "back pay."

7

claim of $921.16 for accrued but unpaid pre-petition vacation pay for January 2004 (Claim No. 45, amended by Claim No. 93).

*Mr. Sivard's Claim*

Francis Sivard was formerly employed as Vice President of Accounting at Peoples Gas, another affiliate of TECO Fiber. On September 2, 2003, he became the debtor's Vice President of Finance. Mr. Sivard agreed that he would receive no salary from the debtor while Michael Hughes continued to serve as the company's controller.[7] He understood from Mr. Holdbrooks, however, that he would be eligible to participate in the debtor's 2003 incentive pay program. Mr. Holdbrooks also offered that the debtor would pay benefits to Mr. Sivard similar to those he would have received at Peoples Gas, including vacation pay. Mr. Sivard received no compensation from the debtor for his services from September 1, 2003 through November 30, 2003; in December 2003, he began receiving compensation at a base salary of $100,000 per year. Mr. Sivard filed a proof of claim (Claim No. 33, amended by Claim No. 92) for $11,667 of incentive pay and for unpaid pre-petition wages in early 2004.[8]

---

[7]  Mr. Hughes left the debtor in December 2003.

[8]  The percentage that TECO Partners applied to a Vice President was 35%. Therefore, the target incentive pay was $35,000.

*Mr. Hughes' Claim*

Michael Hughes was the debtor's controller.[9] During 2003, he received a salary of $72,692. Mr. Sivard filed a proof of claim on Mr. Hughes' behalf in the amount of $18,173 (Claim No. 34) for incentive pay for the entire year.[10]

*Mr. Savage's Claim*

Michael Savage was employed as the customer service and billing manager of the debtor. During 2003, he received a salary of $53,000. Mr. Sivard filed a proof of claim for Mr. Savage in the amount of $7,950 (Claim No. 29) for incentive pay for 2003.[11] Unlike the other claimants, Mr. Savage actually received $2,000 of incentive pay for 2002.

---

Although the debtor achieved its goals for 2003, Mr. Sivard worked for only 4 months. The calculation is: $35,000 target incentive/12 = $2,916.67 x 4 months = $11,667. His original claim was for only $11,250; the claim was later amended to include the entire amount of incentive pay, $11,667.00, or in the alternative, a claim for reasonable "back pay."

[9] Mr. Hughes was hired as controller, but briefly served as a vice president; later, he served as a paid consultant.

[10] The incentive pay percentage was 25%; the target incentive was $18,173. Mr. Hughes was employed by the debtor throughout 2003 and the debtor achieved its goals for 2003, so his claim is for the full target amount of $18,173.

[11] Mr. Savage's incentive pay percentage was 15%; the target incentive was $7,950. Mr. Savage was employed by the debtor throughout the entire year, so his claim was initially for the full target amount of $7,950. The Liquidating Trustee later objected to the *amount* asserted in Mr. Savage's claim, because he had previously received $803 from the estate. The Objection was sustained and the amount of the claim was reduced to $7,147 (Document Nos. 251 and 360).

DISCUSSION

It is undisputed that management's proposed 2003 incentive pay was never approved by a Super Majority Vote of the Members or Managers of the debtor. What is disputed is whether the Operating Agreement had already delegated that authority to the CEO. The Court rejects ACC's contention that the CEO had not been delegated the authority to approve the incentive pay sought by these four claimants.

Section 8.9(p) of the Operating Agreement required a Super Majority Vote for any delegation of authority to the CEO if it exceeded the delegation of authority already set out in Section 8.10 of the Operating Agreement. Section 8.10 of the Operating Agreement delegated to the CEO:

> (a) ...*full authority* to and shall manage, control and oversee the day-to-day business and affairs of the Company and shall perform all other acts as are customary or incident to the management of such business and affairs, which will include the general and administrative affairs of the Company and the operation and maintenance of the Company Assets.

(emphasis added).

The extent of the CEO's day-to-day oversight is set forth in Section 8.11, which grants, among other things, the authority to hire and terminate the employment or services of employees of the debtor (Section 8.11(g)). Further, a Super

Majority Vote was not required for any single expenditure, or series of related capital expenditures, less than $100,000 (Section 8.9(g)); nor was a Super Majority Vote required for the CEO to bind the company to any single contract of (1) $250,000 or less, in the ordinary course of business, or (2) $100,000 or less that was not in the ordinary course of business (Section 8.9(h)).

A contract should be read to give reasonable meaning to all of its provisions, instead of a reading which leaves parts useless or inexplicable. *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n.*, 117 F.3d 1328, 1338 (11th Cir. 1997); *Maccaferri Gabions, Inc. v. Dynateria, Inc.*, 91 F.3d 1431, 1442 (11th Cir. 1996). The only reasonable way to read the relevant provisions of the Operating Agreement is that the CEO was granted "full authority" to perform the acts customary or incidental to the management of the debtor, including the authority to hire and fire employees. Incidental to that power was the ability to set compensation, so long as certain dollar limitations (either $250,000, in the ordinary course of business, or $100,000, if outside the ordinary course of business) were not exceeded.

The debtor had paid employee incentives for 2002 and had begun reporting accruals of incentive pay for 2003 before ACC acquired its interest. The incentive pay program was customary to the management of the debtor and the maintenance of the debtor's operations.

To read the Operating Agreement any other way would negate the CEO's authority to hire and retain employees. It would have made the CEO's express authority to "hire and fire" meaningless, particularly in view of the prior ordinary course of the debtor's business.

The Court concludes that the authority to establish employee (or executive) compensation, so long as such compensation involved amounts less than the dollar limits specified for a Super Majority Vote (Sections 8.9(g) and (h)) was expressly granted to the CEO by the Operating Agreement itself. The proposed 2003 employee incentive pay was less than the $100,000 "single expenditure" of Section 8.9(g). The employment of the claimants and other employees, after ACC became the 51% owner, did not exceed the dollar provisions of Sections 8.9(g) or (h).

These claimants changed their employment, or continued with the debtor, in reliance on the promise of

incentive pay.[12] They expected a compensation package substantially the same as they had received in their prior positions, including incentive and vacation pay.

In particular, ACC induced Mr. Holdbrooks to leave his employment at TECO Partners to devote his efforts, full time, to the debtor. ACC wrote Mr. Holdbrooks a letter, dated September 16, 2003, offering him a compensation package substantially the same as his TECO compensation. ACC subsequently tendered an employment agreement to Mr. Holdbrooks, offering him the position of President and CEO and for a base salary of $190,000 plus benefits.[13]

ACC participated in the creation of the preliminary budget that was used to calculate the prospective bonuses. ACC reviewed the proposed incentive pay, criticizing only the dollar amount one claimant (Michael Hughes) should receive. Only in December 2003, after receiving the benefits of these executives' services, did ACC voice any objection to payment.[14]

---

[12] Mr. Holdbrooks, Mr. Sivard and Mr. Hughes left affiliates of TECO Fiber. Mr. Savage relocated from Louisiana to work for the debtor.

[13] Mr. Holdbrooks never signed the employment agreement because certain terms were still being negotiated with ACC.

[14] There were six other employees that claimed and actually received incentive pay in 2003. Apparently, ACC did not block these payments; nor did it seek to have the estate recover those disbursements.

ACC is thus estopped from asserting that the claims should be disallowed because the Board never met, or because a Super Majority Vote of the Board was not obtained. Where a party acts in such a way as to lead others reasonably to change position on the assumption that the party has adopted another's contracts as its own, the party so acting is estopped to disclaim his apparent position as a party to the contract. *Bender v. Centrust Mortgage Corp.*, 833 F.Supp. 1525, 1535 (S.D. Fla. 1992)(citations omitted); *see also First Southern Ins. Co. v. Ocean State Bank*, 562 So.2d 798, 800 (Fla. 1st DCA 1990).

Estoppel is based on "the acceptance and retention of benefits by one having knowledge or notice of the facts of benefits from a contract...which he might have rejected or contested... It precludes one who accepts the benefits from repudiating the accompanying or resulting obligation." *Westminster Assocs., Ltd. v. Orkin Exterminating Co. (In re Westminster Assocs., Ltd.)*, 285 B.R. 38, 47 (Bankr. M.D. Fla. 2002)(citing *Doyle v. Tutan*, 110 So.2d 42, 47 (Fla. 3rd DCA 1959)); *See In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 717 (Bankr. M.D. Fla. 2000)(finding the debtor was estopped from contesting a creditor's administrative claim when the

debtor induced the creditor to perform services and willingly accepted the benefits thereof).

The Liquidating Trustee is holding sufficient funds to pay all creditors in full. The only impact in allowing these claims is that it will slightly diminish what the owners will receive. It now appears that ACC may no longer be an equity holder.[15] The remaining two owners do not oppose these claims.

Mr. Holdbrooks and Mr. Sivard filed amended claims asserting -- only if their claims for incentive pay were disallowed -- entitlement to reasonable compensation for work performed or "back pay" (Claim Nos. 94 and 92, respectively). Because the claims for employee incentive pay are being allowed, the amendments seeking reasonable compensation in lieu of incentive pay will be disallowed.

---

[15] ACC filed a proof of claim for $10.25 million, premised on claims asserted in its state court action (later removed to this Court as Adversary Proceeding 04-490). The Liquidating Trustee objected to ACC's claim. The Court deferred ruling on that objection pending the outcome of the removed adversary proceeding. In that proceeding, all of ACC's claims were dismissed, but ACC failed to timely file an amended complaint (Document Nos. 93, 145, and 152). Thus, it appears that ACC no longer has a claim against this bankruptcy estate. Later in the same proceeding, ACC's affirmative defenses (to the debtor's counterclaim) were stricken for its failure to comply with discovery obligations. The Court entered a final judgment against ACC on the counterclaim (Document No. 189). It would seem that ACC has no equity interest and will not be entitled to receive a distribution as an equity security holder.

Finally, the claimants requested that this Court retain jurisdiction to assess attorney's fees and costs against ACC. The claimants rely on Section 448.08, Florida Statutes, which provides that "[t]he court may award to the prevailing party in an action for unpaid wages costs of the action and a reasonable attorney's fee." There was no litigation for unpaid wages; the claimants were "proving up" the claims they had filed against this bankruptcy estate. Accordingly, attorney's fees and costs will not be awarded. *See Securities Investor Protection Corp. v. C.J. Wright & Co. (In re C.J. Wright & Co.)*, 183 B.R. 305, 307 (Bankr. M.D. Fla. 1995)(construing Section 448.08 to apply only to the prevailing party in a state court action).

CONCLUSION

Although it might have been politic and wise for management to seek the Board's approval of executives' incentive pay, such consensus was impossible amidst the owners' dispute. In that circumstance, the CEO could invoke the authority granted by the Operating Agreement to award employee incentive pay and vacation pay, without a Board vote. Further, ACC is estopped from objecting to these claims. Therefore, ACC's objections to the subject claims are

16

overruled. The claims by Mr. Holdbrooks and Mr. Sivard for "back pay" are disallowed.

Accordingly, it is hereby

**ORDERED:**

1. Mr. Holdbrooks' Claim Number 32, as amended by Claim Number 94, is allowed as a general unsecured claim in the amount of $15,833.00.

2. Mr. Sivard's Claim Number 33, as amended by Claim Number 92, is allowed as a general unsecured claim in the amount of $11,667.00.

3. Mr. Hughes' Claim Number 34 is allowed as a general unsecured claim in the amount of $18,173.00.

4. Mr. Savage's Claim Number 29 is allowed as a general unsecured claim in the amount of $7,147.00.

5. Mr. Holdbrooks' Claim Number 45, as amended by Claim Number 93, is allowed as an unsecured priority claim in the amount of $4,925.00 and as a general unsecured claim in the amount of $921.16.

DONE and ORDERED this 25 day of AUGUST, 2006.

_____
K. Rodney May
United States Bankruptcy Judge

Copies Furnished To:

Litestream Technologies, LLC, Debtor, Post Office Box 172986, Tampa, Florida 33672

Larry S. Hyman, C.P.A., Chapter 11 Liquidating Trustee, P.O. Box 18614, Tampa, Florida 33679

Patrick T. Lennon, Esquire, Attorney for Debtor, Post Office Box 1531, Tampa, Florida 33601

Edwin G. Rice, Esquire, Attorney for Claimants Michael Hughes and Michael Savage, 100 South Ashley Drive, Suite 1300, Tampa, Florida 33602-5309

John J. Lamoureux, Esquire, Attorney for Claimants Philip Holdbrooks and Francis Sivard, P.O. Box 3239, Tampa, Florida 33601-3239

American Capital Corporation, c/o Gerald Parker, 625 Flagler Drive, Suite 605, West Palm Beach, Florida 33401

Theresa M. Boatner, Esquire, Office of United States Trustee, Timberlake Annex, Suite 1200, 501 E. Polk Street, Tampa, Florida 33602